[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 7, 2012
JOHN LEY
CLERK

No. 11-10231

_____

D.C. Docket No. 1:09-cv-02985-RWS


JORDAN E. LUBIN,
Chapter 7 Trustee,

                                        Plaintiff - Cross Claimant - Appellant,

FEDERAL DEPOSIT INSURANCE CORPORATION,
as receiver for Integrity Bank of Alpharetta, Georgia,

                                        Intervenor Plaintiff - Cross Defendant - Appellee,

versus

CINCINNATI INSURANCE COMPANY,

                                        Defendant - Appellee.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(February 7, 2012)

Before MARTIN, HILL and EBEL,[*] Circuit Judges.

PER CURIAM:

Integrity Bancshares, Inc. ("Bancshares") and its wholly owned subsidiary, Integrity Bank ("Bank"), were both named insureds of a financial institution bond that offered, among other things, fidelity insurance.[1] In November 2007, the Bank submitted a proof of loss to the insurer, Cincinnati Insurance Co. ("Cincinnati"), stating that "[it] has sustained a loss resulting directly from dishonest or fraudulent acts of certain employees of [the Bank]." In August 2008, Cincinnati denied the insurance claim. Later that month, the Bank was closed, and the FDIC took over as receiver. Bancshares then filed for Chapter 7 bankruptcy, and Jordan Lubin was appointed bankruptcy trustee.

This case began when Mr. Lubin ("Trustee") filed suit against Cincinnati, seeking to recover under the fidelity bond. The FDIC intervened, taking the position that as the receiver for the Bank, it has the exclusive right to pursue that breach-of-contract claim. The district court agreed with the FDIC and dismissed the Trustee's claims. On appeal, the Trustee argues that the district court erred in

[*] Honorable David M. Ebel, Senior United States Circuit Judge for the Tenth Circuit, sitting by designation.

[1] Bancshares was the only named insured when the Bond was issued. The District Court reformed the Bond to name the Bank as an insured as well. The parties do not contest that decision on appeal.

2

holding that he does not have the right to pursue the breach-of-contract claim After careful review, we affirm.

The Trustee argues that the Bond insured Bancshares "against a loss regardless of which insured's employees . . . caused the loss." In support of his position, the Trustee points to Insuring Agreement A of the Bond. Under that provision, Cincinnati agreed to "indemnify <u>the</u> Insured" for "[l]oss directly resulting from dishonest or fraudulent acts of an Employee committed alone or in collusion with others." (Emphasis added.) The Bond defines the term "dishonest or fraudulent acts" as including those that are "committed by such Employee with the manifest intent . . . to cause <u>the</u> Insured to sustain such loss." (Emphasis added.) The Bond defines the term "Employee" as including "an officer or other employee of <u>the</u> Insured." (Emphasis added.)

The Trustee's argument does not convince us because it conflicts with the plain language of Insuring Agreement A. The word "the" is used to "indicate that a following noun . . . is a unique or a particular member of its class." <u>Merriam-Webster's Collegiate Dictionary</u> 1217 (10th ed. 2000). Thus, under the Bond, an insured is covered for losses caused by its own employees, and not that of another insured. In other words, the Bond insures Bancshares against a loss caused by its own employees, and not those of the Bank. The November 2007 proof of loss

3

contains only a claim that employees of the Bank (and not Bancshares) engaged in misconduct and that this caused the Bank (and not Bancshares) to sustain a loss.[2] Thus, it was the Bank, and not Bancshares, that had the right to bring the breach-of-contract claim premised on that proof of loss. See O.C.G.A. § 9-2-20(a) ("As a general rule, an action on a contract [must] be brought in the name of the party in whom the legal interest in the contract is vested . . . .").[3]

The Trustee resists this conclusion, arguing that this understanding of Insuring Agreement A would deprive Bancshares of coverage. This is far from the case, however: Bancshares had fidelity insurance for the conduct of its own employees. The Trustee also stresses that this view of Insuring Agreement A would conflict with the intention of the parties, who sought to protect the financial interests of Bancshares as the holding company of the Bank. This argument also fails. When the plain language of an insurance contract is clear and unambiguous, it alone establishes the intentions of the parties. Boardman Petroleum, Inc. v.

---

[2] The Trustee's complaint alleges that one of the employees was employed by both the Bank and Bancshares and that he committed the dishonest or fraudulent acts in both capacities. The proof of loss in this record, however, refers only to employees of the Bank. It does not refer in any way to Bancshares. The Trustee has not disputed the authenticity of the proof of loss.

[3] Because we conclude that Cincinnati's promise to cover losses caused by employee misconduct runs to the insured whose employees are at issue, and not to any other named insured, we do not address the Trustee's argument regarding the scope of Exclusion W under the Bond, which was a focus of the district court's analysis.

4

Federated Mut. Ins. Co., 498 S.E.2d 492, 494 (Ga. 1998).

Finally, the Trustee argues that the joint insured clause of the Bond gave Bancshares a right of action. That clause states in part: "If two or more Insureds are covered under this bond, the first named Insured shall act for all insureds. Payment by [Cincinnati] to the first named Insured of loss sustained by any Insured shall fully release [Cincinnati] on account of such loss." The Trustee draws attention to the fact that under this clause, Bancshares, as the first named insured, "shall act" for the Bank. He also emphasizes that under the clause, Bancshares is entitled to receive from Cincinnati the insurance proceeds for any insured.

We do not read the clause in the same way as does the Trustee. The phrase "act for" simply creates an agency relationship. See O.C.G.A. § 10-6-1 ("The relation of principal and agent arises wherever one person . . . authorizes another to act for him . . . ."). Thus, under the joint insured clause, Bancshares agreed to be an agent for the Bank. The fact that Bancshares was entitled to receive payment from Cincinnati does not mean that it could keep it. See, e.g., Courts v. Jones, 8 S.E.2d 178, 179–80 (Ga. Ct. App. 1940); Restatement (Third) of Agency § 8.12 cmt. b (2006) ("If the agent receives property for the principal, the agent's duty is to use due care to safeguard it pending delivery to the principal.").

The joint insured clause thus, at the very most, left only the possibility that Bancshares could sue Cincinnati on behalf of the Bank. Under the Bankruptcy Code, however, "property of the estate" does not include "any power that the debtor may exercise solely for the benefit of an entity other than the debtor." 11 U.S.C. § 541(b)(1). In other words, "if property is in the debtor's hands as agent, the property or proceeds therefrom are not treated as property of the debtor's estate." In re Rine & Rine Auctioneers, 74 F.3d 854, 857 (8th Cir. 1996); see also In re Stevens, 130 F.3d 1027, 1029 (11th Cir. 1997). Thus, insofar as the joint insured clause authorized Bancshares to sue Cincinnati on behalf of the Bank, that cause of action was not property of Bancshares' bankruptcy estate.

For these reasons, we conclude that the district court did not err in holding that the Trustee does not have the right to pursue the breach-of-contract claim premised on the November 2007 proof of loss. We therefore affirm the judgment of the district court.

**AFFIRMED.**